IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DR. SHARRON HERRON-
WILLIAMS,

   Plaintiff,

  v.

ALABAMA STATE
UNIVERSITY,

   Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: 2:16-CV-293-WKW
[WO]

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Alabama State University's motion for summary judgment on each of Plaintiff Sharron Herron-Williams's claims alleging employment discrimination and retaliation. (Doc. # 29.) The parties have fully briefed the motion and submitted evidence in support of their respective positions. (Docs. # 29, 42, 47, 48.)

The parties generally agree on what happened. They agree that Plaintiff—a black woman—was a tenured professor for Defendant from 2008 until she accepted a position at another university sometime after initiating this action. They agree that she was assigned to supervise Defendant's Office of Minority and International

Affairs (OMIA)[1] in February of 2014, that she did not receive the authorization or equipment she requested while she supervised OMIA, and that she was relieved of those supervisory duties in September of 2014.  They agree that she served as Defendant's faculty athletic representative (FAR) from 2009 until her last FAR contract expired on September 30, 2014.  They agree that Plaintiff's salary was reduced in October of 2015.

But although the parties agree as to the "what" at issue, they disagree as to the "why."  And because Plaintiff brings claims under the nondiscrimination and anti-retaliation provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, the "why" is the heart of this action.

Plaintiff offers three answers to the "why" questions: (1) race and/or gender discrimination; (2) retaliation for an email Plaintiff sent to Dr. Gwendolyn Boyd—Defendant's president at that time—on August 6, 2014, in which Plaintiff protested what she perceived to be race and/or gender discrimination; and/or (3) retaliation for filing a charge with the Equal Employment Opportunity Commission (EEOC). Consequently, in six counts in her Amended Complaint (Doc. # 22), Plaintiff contends that the actions taken by Defendant which she now challenges—denying

---

[1] Apparently OMIA has changed names at various times.  (Doc. # 29-4, at 19; Doc. # 29-5, at 68.)  For the sake of clarity, the court refers to that office as "OMIA" throughout this opinion.

2

her the authorization and equipment she requested while supervising OMIA, relieving Plaintiff of her OMIA duties, not renewing her FAR contract, and reducing her salary—violated Title VII.

Defendant offers more innocuous explanations for its actions. According to Defendant, Plaintiff's requests for equipment while she supervised OMIA were denied because additional equipment was unnecessary. She was denied the authorization she requested because Defendant did not want to give that authority to an interim supervisor and it was not really necessary. She was eventually relieved of her OMIA duties to accelerate the process of finding a permanent supervisor for OMIA. Her one-year FAR contract expired on its own terms on September 30, 2014, and Defendant's president did not renew Plaintiff because she preferred to pick her own FAR. And Plaintiff's pay was reduced to that of a tenured professor because she was no longer serving Defendant as anything other than a tenured professor.

Plaintiff has since conceded that Defendant is entitled to summary judgment on her claims that her removal from the FAR position was the result of illegal discrimination, which are in Count Four of her Amended Complaint. (Doc. # 47, at 35.) Defendant's motion for summary judgment is thus due to be granted with respect to Count Four.

Plaintiff's other claims meet a similar fate because there is no genuine dispute of material fact for trial.  Consequently, Defendant's motion for summary judgment (Doc. # 29) is due to be granted.

## I.  JURISDICTION AND VENUE

The court exercises subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343.  The parties do not contest personal jurisdiction or venue.

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn from it, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. FACTS

Most of Plaintiff's time working for Defendant was uneventful. Plaintiff began working for Defendant in August of 2003 as an associate professor. She was granted tenure in 2008 and achieved the rank of full professor in 2009. She went on to serve as interim dean for the College of Liberal Arts and Social Sciences and interim associate provost in the Office of Academic Affairs. For each of those interim positions, Plaintiff received a pay stipend. Plaintiff left Defendant for a position at another university in early 2017.

Of course, Plaintiff's time working for Defendant was not entirely without conflict. The year 2014 was particularly eventful, largely because of Plaintiff's tumultuous time supervising OMIA but also because her time as Defendant's FAR came to an end. In October of the following year, she received a substantial pay cut. Because these events are the focus of Plaintiff's claims, they are each discussed in detail below.

The applicability of Title VII to the claims in this case is not questioned, as the parties agree that Defendant is an employer covered by Title VII (Doc. # 22, ¶ 4, at 2; Doc. # 23, ¶ 4, at 1) and that Plaintiff was an employee of Defendant at all relevant times under Title VII (Doc. # 22, ¶ 4, at 2; Doc. # 23, ¶ 4, at 1).

## A.     Plaintiff's Tumultuous Time Supervising OMIA

Plaintiff supervised OMIA from February of 2014 until the following September. She faced many difficulties during that time, most prominently a lack of authorization and equipment that hampered OMIA's operations. Those difficulties eventually led Plaintiff to send an email to Defendant's then-president— Dr. Boyd—on August 6, 2014, in which she complained about the various problems she had encountered during her time supervising OMIA and suggested that she was the victim of unlawful discrimination. A month after sending that email, Plaintiff was relieved of her OMIA duties.

Plaintiff's time supervising OMIA—especially the end of her supervisory duties—is the focus of this action. Consequently, it merits considerably more discussion than the rest of her time working for Defendant.

### 1.     *Plaintiff's Reassignment to OMIA*

On February 17, 2014, Dr. Leon Wilson—a black male who at the time was the provost for Defendant—sent Plaintiff a memorandum informing her that her time as interim associate provost had come to an end and that her primary appointment

would be that of professor. The memo also informed Plaintiff that she would "be assigned special duties with Academic Affairs" and that she would "continue the supervision of" OMIA. (Doc. # 29-3, at 28.) Dr. Wilson sent a superseding memo on February 28, 2014, that corrected Plaintiff's professorial appointment but was otherwise the same as the February 17, 2014 memo. (Doc. # 29-3, at 30.) Officially, Plaintiff did not receive additional compensation for this role (Doc. # 29-4, at 35; Doc. # 29-5, at 29), but Dr. Wilson gave her this role to justify allowing her to remain at the salary she received while she served as interim associate provost (Doc. # 29-5, at 29).

### 2. *Plaintiff's Requests for Authorization*

During her assignment to supervise OMIA, Plaintiff's primary task was to oversee the processing and submission of forms that Defendant's international students are required to submit to the U.S. Department of Homeland Security. In order to complete this task, Plaintiff believed that she needed to receive authorization from Dr. Boyd in the form of an appointment designating her as Defendant's principal designated school official (PDSO) per Homeland Security regulations. Despite making multiple requests (Doc. # 29-4, at 20, 72; Doc. # 29-3, at 40–42; Doc. # 46-1, at 12–18), Plaintiff never received the PDSO designation (Doc. # 29-4, at 72). The reason why is disputed.

Plaintiff believes discrimination is to blame, specifically race and/or gender discrimination. The only clear basis for her allegations of race and/or gender discrimination is that the individual who was in charge of OMIA before Plaintiff was assigned to supervise it—Dr. Steven Havron—is a white male. (Doc. # 29-4, at 30.) Dr. Havron had received the PDSO designation from one of Defendant's presidents who preceded Dr. Boyd. (*See* Doc. # 29-4, at 19, 41, 72; Doc. # 29-5, at 44–45; Doc. # 29-6, at 5.) When Dr. Havron retired, Plaintiff took over as the supervisor for OMIA. Sometime after Plaintiff began supervising OMIA but before she sent her August 6, 2014 email to Dr. Boyd, Dr. Wilson asked Dr. Havron to come out of retirement to once again take charge of OMIA, but Dr. Havron declined. Plaintiff's August 6, 2014 email seems to allege that Dr. Wilson's desire to bring Dr. Havron back was the reason Plaintiff did not receive the PDSO designation, although her email does not reference Dr. Havron's race or gender. (Doc. # 29-3, at 41.)

Defendant does not offer quite as clear of a reason why Plaintiff never received the PDSO designation. Dr. Wilson and Dr. Charles Smith—who was Defendant's Vice President of Student Affairs at the time—said they each brought the issue to Dr. Boyd's attention and told her that it was important that she give Plaintiff the PDSO designation. (Doc. # 29-5, at 48; Doc. # 29-6, at 5–6.) Dr. Smith also placed some of the blame on Dr. Wilson (Doc. # 29-6, at 12–13), but Dr. Wilson suggested that Dr. Boyd alone was to blame (Doc. # 29-5, at 25, 32, 43–44, 48), in

part because Dr. Boyd allegedly told him she did not want to give the PDSO designation to Plaintiff because she was supervising OMIA on an interim basis (Doc. # 29-5, at 25). Dr. Boyd, for her part, appeared to be under the impression that someone still had the requisite authority to oversee OMIA because some of OMIA's work was getting done. She also thought that giving Plaintiff the PDSO designation was a matter for Dr. Wilson and/or Dr. Smith to handle. (Doc. # 46-1, at 14–16.) She further suggests that the PDSO designation forms may have gotten lost in the shuffle of her other duties as president. (Doc. # 46-1, at 16.)

But whatever the reason, Dr. Boyd did not give Plaintiff the PDSO designation. Plaintiff claims this severely hindered OMIA's operations during her time supervising OMIA. (Doc. # 29-4, at 21–22.) Although Dr. Boyd might dispute this causal effect (Doc. # 46-1, at 14, 16), the parties seem to agree that OMIA was not functioning properly while it was under Plaintiff's supervision (Doc. # 29-4, at 21-22, 24–25, 72; Doc. # 29-5, at 24, 31; Doc. # 46-1, at 11). In fact, much of OMIA's work had to be done by individuals in other offices—namely, Nicole Miller (a black female who worked for Defendant's Office of Admissions) and Georgette Varner (a black female who worked in Defendant's School of Graduate Studies)— who had received a lesser level of authorization than the PDSO designation. (Doc. # 29-4, at 22, 24–25, 66–67; Doc. # 29-7, at 15.)

### 3.     *Plaintiff's Requests for Equipment*

Throughout Plaintiff's time supervising OMIA, Defendant provided the same equipment to OMIA as it had during Dr. Havron's tenure.  (Doc. # 29-4, at 19; Doc. # 29-5, at 27.)  That equipment included two outdated computers, but did not include a printer.  (Doc. # 29-4, at 15, 19; Doc. # 29-3, at 37.)  Dr. Havron had brought a printer he owned to OMIA while he supervised the office, and he apparently took his printer with him when he retired.  Plaintiff requested additional equipment for the office, but Dr. Wilson denied the request after initially approving it because he thought OMIA did not need additional equipment.  (Doc. # 29-5, at 27.)  Plaintiff continued to request additional equipment, but her subsequent requests were denied. (Doc. # 29-4, at 15; Doc. # 29-3, at 37–38.)  The limited equipment available to OMIA while it was under Plaintiff's supervision further hindered the office's operations.  (*See* Doc. # 29-4, at 15; Doc. # 29-3, at 37–38.)

### 4.     *Plaintiff's August 6, 2014 Email to Dr. Boyd*

Plaintiff apparently reached her breaking point on August 6, 2014.  On that date, Plaintiff sent an email to Dr. Boyd complaining about the above-described struggles she had faced in her time supervising OMIA and demanding some sort of remedial action from Dr. Boyd.  (Doc. # 29-3, at 40–42.)  Many of Plaintiff's complaints focused on Dr. Wilson.  Her litany of accusations against him included: undercutting Plaintiff's authority by changing his mind about giving OMIA better

equipment; trying to lure Dr. Havron out of retirement to replace Plaintiff behind Plaintiff's back; holding up the PDSO designation process; soliciting applications for Plaintiff's job without any notice to Plaintiff; and otherwise interfering with OMIA. (Doc. # 29-3, at 40–42.) Dr. Wilson disputed most of these allegations—or at least disputed that there were any illicit motivations behind his actions. (*E.g.*, Doc. # 29-5, at 25, 27, 33, 38, 48.)

Of particular relevance here, Plaintiff offered her opinion on the reasons behind the actions and circumstances about which she complained. In the eleventh paragraph of her email, she wrote: "In my case, the intolerable actions of Dr. Wilson and a few other administrators can only be based on gender, age, or educational background if not race and ethnicity." (Doc. # 29-3, at 40–42.) Plaintiff offered no support for this conclusion in her email, and she never filed a complaint with Defendant's human resources department regarding her claims of discrimination (Doc. # 29-4, at 71).

Dr. Boyd claims she does not remember receiving Plaintiff's email (Doc. # 46-1, at 17), but Dr. Wilson said Dr. Boyd showed him the email without offering an opinion on it (Doc. # 29-5, at 37).

### 5. *The End of Plaintiff's OMIA Duties*

On September 11, 2014—five weeks after Plaintiff sent Dr. Boyd the email discussed in the previous subsection—Dr. Wilson sent Plaintiff a memorandum

informing her that her time supervising OMIA had come to an end and that she was "reassigned to [her] primary assignment" as a professor in the College of Liberal Arts and Social Sciences. (Doc. # 29-3, at 44.) The memorandum did not offer any explanation for the change. There is some dispute as to whether Plaintiff was given a new office space after she vacated her OMIA office—Plaintiff claims she was not (Doc. # 29-4, at 34), but Dr. Wilson claims she was offered an office and rejected it (Doc. # 29-5, at 22).

Plaintiff's former position supervising OMIA remained vacant until December of 2015 when Dr. Boyd appointed Carol Williams (a black female) to replace Plaintiff on an interim basis. (Doc. # 29-7, at 13–14.) Carol Williams did not receive the PDSO designation (Doc. # 29-7, at 15), and OMIA still had the same equipment during her time with the office as it did when Dr. Havron supervised the office, although Ms. Williams did take her computer and printer with her (Doc. # 29-7, at 18). The position was permanently filled in 2017, when Dr. Wilson—who was Defendant's interim president at the time—appointed Dr. Linwood Whitten (a black male) to the position.

## B.     Plaintiff's Seemingly Uneventful Time as FAR

Plaintiff was appointed to the FAR position in 2009 by Dr. William Harris, Defendant's president at the time. (Doc. # 29-4, at 11–12.) She remained in that position until her last FAR contract expired on September 30, 2014—less than two

months after Plaintiff's August 6, 2014 email to Dr. Boyd. (Doc. # 29–4, at 11–12; Doc. # 29-3, at 75–83.) Initially, Plaintiff did not realize her final FAR contract had expired. She continued to perform the duties of the FAR without pay until November of 2014, when she finally learned that her contract had expired and that she would no longer receive the corresponding pay stipend. (*See* Doc. # 29-4, at 12, 42; Doc. # 46-1, at 50–52.)

Dr. Boyd did not appoint a replacement for Plaintiff until March of 2015, when she appointed Dr. Sara Kiser (a white female) to the position. (Doc. # 46-3, at 2.) Two minority candidates (black females) were considered for the FAR position before it was offered to Dr. Kiser, but they did not receive the requisite permission from the deans of their respective colleges to accept the position and thus could not accept an appointment to the position. (Doc. # 29-3, at 87–88.) Dr. Kiser continues to serve as Defendant's FAR.

## C.  **Plaintiff's Unexpected (but Possibly Overdue) Pay Cut**

On September 10, 2015—over a year after Plaintiff had been relieved of her OMIA duties—Plaintiff received a memo from Dr. Wilson informing her that her salary "reverted back to that of a Professor" as of October 1, 2015. (Doc. # 29-3, at 46.) Plaintiff claims that was a pay cut of about $20,000 a year. (Doc. # 29-4, at 44; *see* Doc. # 29-3, at 34–35.) This pay cut came six months after Plaintiff filed her first (and subsequently amended) charge of discrimination with the EEOC. (Doc.

# 46-6; Doc. # 29-3, at 91–92; Doc. # 29-3, at 46; Doc. # 29-4, at 44; Doc. # 46-1, at 24.) Dr. Wilson and Dr. Boyd attribute the pay cut to the elimination of the stipend Plaintiff received for serving as interim associate provost. (Doc. # 29-3, at 46; Doc. # 29-5, at 57; Doc. # 46-1, at 24.) They each asserted that the pay cut had nothing to do with the end of Plaintiff's OMIA duties because Plaintiff did not receive extra compensation for those duties. (Doc. # 29-5, at 29; Doc. # 46-1, at 24.)

Plaintiff claims that the pay cut broke from Defendant's usual practice of allowing professors to keep any additional salary from administrative positions even after their service in those positions ended. But according to Dr. Wilson, that practice was the reason Plaintiff's pay was not cut immediately upon the end of her time as interim associate provost. (Doc. # 29-3, at 25; Doc. # 29-5, at 29.) It was also the reason he assigned her to supervise OMIA. (Doc. # 29-5, at 29.) But after Plaintiff was relieved of her OMIA duties, Dr. Wilson "could not justify" allowing her to remain at the salary she received as interim associate provost. (Doc. # 29-5, at 52.)

## IV.  PROCEDURAL HISTORY

### A.    Plaintiff's First EEOC Charge

Plaintiff filed her first EEOC charge on March 9, 2015 (Doc. # 46-6) and amended it the next day (Doc. # 29-3, at 91–92). On the section of the form labeled "CAUSE OF DISCRIMINATION BASED ON," Plaintiff checked "SEX,"

14

"RETALIATION," and "AGE," but not "RACE." (Doc. #29-3, at 91.) However, she clearly alleged racial discrimination with regard to her time supervising OMIA in the declaration attached to her amended charge. (Doc. # 29-3, at 92 ("I believe this discriminatory and hostile treatment was based upon my age, *race* and/or gender." (emphasis added)).)

That declaration also summarized Plaintiff's complaints about her time supervising OMIA and the end of her OMIA duties; she attributed both to unlawful discrimination and the latter to unlawful retaliation for protesting unlawful discrimination as well. (Doc. # 29-3, at 92.) Plaintiff's declaration further complains about the nonrenewal of her FAR contract. (Doc. # 29-3, at 92.) But notably absent from that declaration is any allegation that the nonrenewal of her FAR contract was the product of unlawful discrimination; instead, Plaintiff attributed the nonrenewal only to unlawful retaliation for protesting unlawful discrimination. (Doc. # 29-3, at 92.)

On January 27, 2016, the Civil Rights Division of the U.S. Department of Justice issued Plaintiff a notice of her right to sue on her first EEOC charge. (Doc. # 22, at 28.)

## B.    Plaintiff's Second EEOC Charge

Plaintiff filed her second charge of discrimination with the EEOC on January 25, 2016. (Doc. # 29-3, at 94–97.) That charge focused on her October 2015 pay

cut. (Doc. # 29-3, at 94.) On the section of the form labeled "CAUSE OF DISCRIMINATION BASED ON," Plaintiff once again checked "SEX," "RETALIATION," and "AGE," but not "RACE." (Doc. #29-3, at 94.) But unlike her first EEOC charge, Plaintiff did not allege racial discrimination in the declaration attached to her amended charge. (Doc. # 29-3, at 94 (claiming "discrimination based upon my age (over 40 years old) and/or my gender, female," without claiming racial discrimination); Doc. # 29-3, at 97.) Regardless, Plaintiff referenced her earlier allegations of racial discrimination on each page of her declaration. (Doc. # 29-3, at 94–97.)

The declaration detailed Plaintiff's complaints about her October 2015 pay cut, although it also provided greater detail about the subjects of her first EEOC charge. Plaintiff attributed the pay cut to unlawful retaliation for protesting unlawful discrimination (on the basis of her age, gender, and/or race) and/or filing her first EEOC charge; Plaintiff also attributed the pay cut, alternatively or additionally, to unlawful discrimination based on her age and/or gender—but not her race. (Doc. # 29-3, at 94, 97.)

On October 17, 2016, the Civil Rights Division of the U.S. Department of Justice issued Plaintiff a notice of her right to sue on her second EEOC charge. (Doc. # 22, at 30–32.)

## C.    <u>The Present Action</u>

Plaintiff filed her Complaint (Doc. # 1) on April 25, 2016, and Defendant filed its Answer on May 23, 2016 (Doc. # 6). Plaintiff filed a motion (Doc. # 18) to amend her Complaint on December 2, 2016. The court granted the motion on December 5, 2016 (Doc. # 21); Plaintiff filed her Amended Complaint (Doc. # 22) later that day; and Defendant filed its answer on December 19, 2016 (Doc. # 23).

Plaintiff's Amended Complaint includes six counts, each of which is brought under Title VII. Counts One and Two address how Plaintiff was treated while she supervised OMIA and the termination of Plaintiff's OMIA duties, which Plaintiff attributes to unlawful retaliation in Count One (Doc. # 22, at 6–8) and unlawful race and/or gender discrimination in Count Two (Doc. # 22, at 8–11). Counts Three and Four address the nonrenewal of Plaintiff's FAR contract, which Plaintiff attributes to unlawful retaliation in Count Three (Doc. # 22, at 11–15) and unlawful race and/or gender discrimination in Count Four (Doc. # 22, at 15–18). Counts Five and Six address her October 2015 pay cut, which Plaintiff attributes to unlawful retaliation in Count Five (Doc. # 22, at 18–22) and unlawful race and/or gender discrimination in Count Six (Doc. # 22, at 22–25). Plaintiff's Amended Complaint does not allege age discrimination, even though she alleged age discrimination in both of her EEOC charges.

Defendant filed its motion for summary judgment along with a brief and evidentiary submissions in support of the motion (Doc. # 29) on September 15, 2017, and filed a corrected brief in support of the motion on October 6, 2017 (Doc. # 42). Plaintiff filed its evidentiary submissions (Doc. # 46) and brief in opposition to Defendant's motion for summary judgment (Doc. # 47) on October 24, 2017. Defendant filed its reply brief (Doc. # 48) on November 3, 2017.

## V. DISCUSSION

The above factual background raises four questions: (1) Why did Defendant deny Plaintiff the authorization and equipment she needed to supervise OMIA? (2) Why did Defendant relieve Plaintiff of her OMIA duties? (3) Why did Defendant not renew Plaintiff's FAR contract? (4) Why did Defendant reduce Plaintiff's pay in October of 2015?

Plaintiff offers three answers to these questions: (A) discrimination based on race and/or gender (Counts Two, Four, and Six); (B) retaliation for the email she sent Dr. Boyd on August 6, 2014 (Counts One, Three, and Five); and (C) retaliation for filing her first EEOC charge. But Plaintiff has not provided enough evidence in support of her answers to these "why" questions to create a genuine dispute of material fact. Defendant's motion for summary judgment is therefore due to be granted as to all of Plaintiff's claims.

Additionally, Defendant's motion is due to be granted with regard to Plaintiff's claims in Count Four for another reason. The parties agree that Plaintiff failed to exhaust her administrative remedies with respect to her claims in Count Four—in which she alleges that Defendant did not renew her FAR contract because of unlawful discrimination—because she did not include any claims to that effect in either of her EEOC charges. (Doc. # 42, at 42–45; Doc. # 47, at 35.) That failure to exhaust provides an independently sufficient basis for the entry of summary judgment in Defendant's favor on Plaintiff's claims in Count Four. *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (per curiam).

On the other hand, Plaintiff's claims that her pay cut was the result of race discrimination (as distinguished from her gender discrimination claims) in Count Six were "like or related to, or grew out of, the allegations contained in her [second] EEOC charge" and thus are not barred under the administrative-exhaustion requirement. *Id.* at 1280.

## A. <u>Discrimination based on race and/or gender is not the answer.</u>

The record gives the strong impression that Defendant did not treat Plaintiff fairly during her time supervising OMIA, ultimately culminating in the end of her supervision of OMIA and a pay cut in October of 2015. It is not entirely clear why Defendant subjected Plaintiff to such treatment. That may explain why Plaintiff, in an apparent search for an explanation, concluded that Defendant's treatment of her

could "only be based on gender, age, or educational background if not race and ethnicity" (Doc. # 29-3, at 42; *see also* Doc. # 22, at 8–11, 22–25), which would clearly be an unlawful employment practice under Title VII, 42 U.S.C. § 2000e-2(a)(1).  Unfortunately for Plaintiff, treating someone unfairly for no clear reason is not inherently a form of unlawful discrimination, and she has otherwise failed to provide sufficient evidence to create a genuine dispute of material fact about her claims that Defendant discriminated against her on the basis of her race and/or gender in violation of Title VII (Counts Two and Six).  Her first answer to the "why" questions is thus due to be rejected, and Defendant is entitled to summary judgment on Plaintiff's claims in Counts Two and Six.

Plaintiff's discrimination claims under Title VII are subject to the three-step burden-shifting analytical framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.  First, a Title VII plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial [and/or gender] discrimination."  *Id.* at 802.  Second, if the plaintiff establishes such a prima facie case, "thereby raising an inference that [s]he was the subject of intentional race discrimination, the burden shifts to the defendant to rebut this inference by presenting legitimate, non-discriminatory reasons for its employment action."  *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (per curiam) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).  Third, "[w]here the

defendant meets this burden, the plaintiff has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." *Id.* at 1565 (citing *McDonnell Douglas*, 411 U.S. at 804; *Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 796 (11th Cir. 1988)). "Put another way, once the employer succeeds in carrying its intermediate burden of production, the ultimate issue in the case becomes whether the plaintiff has proven that the employer intentionally discriminated against h[er] because of h[er] race" and/or gender. *Id.* (citing *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994)).

Applying this framework to Plaintiff's discrimination claims, Plaintiff has failed to carry her initial burden of establishing a prima facie case for any of her discrimination claims because she has failed to show that she "was treated less favorably than a similarly-situated individual outside h[er] protected class[es]," *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802), or that Defendant otherwise discriminated against her based on her race and/or gender. Consequently, Defendant is entitled to summary judgment on Plaintiff's discrimination claims.

1.    *Plaintiff has not established a prima facie case of discrimination.*

Plaintiff must make four showings to establish a prima facie case of discrimination in violation Title VII: "(1) [Plaintiff] is a member of a protected class [or classes]; (2) [Plaintiff] was qualified for [her] position[s]; (3) [Plaintiff] suffered an adverse employment action; and (4) [Plaintiff] was . . . treated less favorably than a similarly-situated individual outside h[er] protected class [or classes]." *Maynard*, 342 F.3d at 1289 (citing *McDonnell Douglas*, 411 U.S. at 802). The parties do not appear to dispute that Plaintiff is a member of two protected classes or that she was qualified to supervise OMIA.

The final two elements, however, are deeply disputed. Defendant argues— oddly so—that neither the $20,000 pay cut in October of 2015 nor the termination of her OMIA duties, which arguably triggered the pay cut, constitutes an adverse employment action. Though those arguments could be rejected on their face, the court will walk through the analysis for good measure. Defendant's arguments on the fourth element, however, are considerably more persuasive because Plaintiff has not shown that an adequate comparator was treated more favorably than Plaintiff.

a.    **Plaintiff suffered adverse employment actions.**

The requirement that a Title VII plaintiff show she suffered an adverse employment action stems from Title VII's definition of an unlawful employment practice. That definition includes "discriminat[ion] against any individual with

22

respect to his compensation, terms, conditions, or privileges of employment . . . because of such individual's race . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). The Eleventh Circuit has further clarified that an adverse employment action is a "*serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001).

A $20,000 pay cut—about seventeen-percent of the $117,000 salary Plaintiff was receiving before the pay cut (Doc. # 29-4, at 44)—is a quintessential adverse employment action. The court is inclined to agree with Plaintiff that Defendant's arguments to the contrary (Doc. # 42, at 46–48) "are frankly hard to understand" (Doc. # 47, at 27).

The pay cut also shows that the termination of Plaintiff's OMIA duties was an adverse employment action when the evidence is viewed in the light most favorable to Plaintiff, the nonmoving party. Dr. Wilson assigned Plaintiff to supervise OMIA to justify allowing her to remain at the salary she received while she served as interim associate provost. (Doc. # 29-5, at 29.) Once she was relieved of those supervisory duties and thus left without any duties beyond those of a tenured professor, there was no reason for Plaintiff to receive a salary above that of a tenured professor. (Doc. # 29-5, at 52.) Conversely, a reasonable factfinder could conclude that Plaintiff's salary would not have been reduced to that of a tenured professor if she continued to supervise OMIA. The termination of Plaintiff's OMIA duties

would therefore be an adverse employment action in that it triggered a $20,000 pay cut.

It is also at least arguable that the termination of Plaintiff's supervision of OMIA resulted in a serious and material change in the terms, conditions, or privileges of her employment independent of the pay cut. That termination left Plaintiff with no duties other than those of a tenured professor and FAR (although she would only remain the FAR for a couple of weeks) for the first time in at least four years. Over the previous four years, she had primarily served in administrative roles, including interim associate provost and interim dean of the College of Liberal Arts and Social Sciences. (Doc. # 29-4, at 10–11.) After such a string of presumably prestigious roles, Plaintiff viewed a relegation to the duties of a tenured professor as a demotion (Doc. # 29-4, at 33), and it reasonably could be viewed as a "reassignment with *significantly* different responsibilities." *Davis*, 245 F.3d at 1239 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (emphasis added)). That alone may constitute an adverse employment action, but adding the pay cut on top of that makes it clear that the termination of her OMIA duties constitutes an adverse employment action.

Because both the pay cut and the termination of Plaintiff's OMIA duties constitute adverse employment actions, the court need not consider whether

Defendant's failure to provide Plaintiff the authorization and equipment she needed to supervise OMIA constitutes an adverse employment action.

In sum, Plaintiff has shown the first three elements of a prima facie case of discrimination under Title VII. The fourth element, however, is a different story.

> **b. Plaintiff has not shown that she was treated less favorably than a similarly-situated employee outside of her protected classes.**

In addition to showing that she is a member of two protected classes, had the requisite qualifications, and suffered adverse employment actions, Plaintiff has provided evidence that she was not given much of a chance to succeed supervising OMIA. But she has not shown that racial or gender discrimination had anything to do with that, nor has she shown that racial or gender discrimination had anything to do with the termination of her OMIA duties or the eventual pay cut. She has therefore failed to establish a prima facie case of discrimination under the *McDonnell Douglas* framework.

The fourth element of the prima facie case of discrimination under the *McDonnell Douglas* framework typically requires a showing that a plaintiff was in some way "treated less favorably than a similarly-situated individual outside her protected class[es]." *Maynard*, 342 F.3d at 1289 (citing *McDonnell Douglas*, 411 U.S. at 802). To satisfy this element, the plaintiff must identify a comparator— someone "similarly situated to the plaintiff in all relevant respects," *Smith v.*

*Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n.17 (11th Cir. 2011) (citing *Holifield*, 115 F.3d at 1562)—whom the defendant treated differently.

Plaintiff's brief in opposition identifies four potential comparators, two for her OMIA claims and two for the claims focused on the October 2015 pay cut. For the former, she identifies (1) Dr. Havron (a white male), who supervised OMIA on a permanent basis before Plaintiff, and (2) an unnamed male who rejected Defendant's offer to supervise OMIA on a permanent basis. (Doc. # 47, at 28.) For the latter, she identifies (3) Dr. Sandra Walker (a black female) and (4) Dr. David Iyegha (a black male), each of whom served as a department chair and were allowed to maintain the salaries they received in their respective positions for at least some period of time after they left those positions. (Doc. # 47, at 43–44.) Dr. Havron is not adequate comparator for Plaintiff because of his considerable experience supervising OMIA on a permanent basis. Plaintiff has failed to provide enough evidence about the unnamed individual who rejected Defendant's offer to supervise OMIA on a permanent basis to show that he would be an adequate comparator, let alone that Plaintiff was treated less favorably than he was. Dr. Walker is not an adequate comparator because she and Plaintiff are members of the same protected classes. And while Dr. Iyegha may be an adequate comparator for Plaintiff's gender discrimination claims, Plaintiff has failed to demonstrate that she was treated less favorably than Dr. Iyegha.

### i. Dr. Havron

Dr. Havron admittedly is not a member of either of Plaintiff's protected classes. But Plaintiff has not shown that she was similarly situated to Dr. Havron in all relevant respects. For one, Dr. Havron supervised OMIA on a permanent basis, whereas Plaintiff supervised OMIA only on an interim basis. And Dr. Havron appears to have supervised OMIA for almost a decade by the time he retired (*see* Doc. # 29-6, at 4, 16), whereas Plaintiff supervised OMIA for less than a year.

Moreover, with regard to her repeated requests for equipment while she supervised OMIA, Plaintiff has not shown that she was treated less favorably than Dr. Havron. To the contrary, Plaintiff has admitted that OMIA had the same equipment while she supervised OMIA that it had when Dr. Havron supervised OMIA. (Doc. # 29-4, at 18–19.)

### ii. The Unnamed Male

As for the unnamed male who declined Defendant's offer to supervise OMIA on a permanent basis, the record does not indicate whether he is an apt comparator for Plaintiff. Absent from the record are this individual's name and race, and pretty much everything else about him other than that he was a man who was a "very well qualified" candidate for the OMIA job, worked at Oakwood University at the time he was offered the OMIA job, and turned down the OMIA job for salary reasons. (Doc. # 29-5, at 28; *see also* Doc. # 29-6, at 7.) That simply is not enough

information for the court to conclude that this man is similarly situated to Plaintiff in all relevant respects or that Plaintiff was treated less favorably than he was.

### iii. Dr. Walker

Dr. Walker is clearly an inapt comparator for Plaintiff. Both parties acknowledge that Dr. Walker is a black female like Plaintiff. As such, she and Plaintiff are each members of the same protected classes. By definition, she is not a comparator for Plaintiff because any difference in Defendant's treatment of Dr. Walker and Plaintiff would have to be attributable to something other than race and/or gender.

### iv. Dr. Iyegha

Dr. Iyegha is a black male, so he is a member of only one of Plaintiff's two protected classes. But he is not similarly situated to Plaintiff in all relevant respects. Dr. Iyegha was the Chair of the Department of Humanities "for many years." (Doc. # 29-3, at 26.) That department was eliminated during the 2014–2015 academic year, and he retired in the beginning of the 2015–2016 academic year. (Doc. # 29-3, at 26.) The parties agree that Dr. Iyegha's pay was not immediately reduced upon the end of his time as a department chair because Dr. Wilson gave him additional administrative duties, although there is some dispute as to whether his pay was ever reduced. (*Compare* Doc. # 29-3, at 26 ("[Dr. Wilson] continued [Dr. Iyegha's] administrative pay from the time of department elimination until shortly before his

retirement"), *with* Doc. # 47, at 44 ("Wilson provided Iyegha with additional administrative duties and continued to pay him his administrative supplement until Iyegha's retirement.").) Plaintiff, on the other hand, did not hold any of her administrative positions for very long (either individually or cumulatively) and was nowhere near retirement age when she lost her additional administrative duties.

But even assuming Dr. Iyegha is an adequate comparator for Plaintiff, Plaintiff has not shown that she was treated less favorably than Dr. Iyegha. As Defendant outlines in its brief in support (Doc. # 42, at 52–53), both Plaintiff and Dr. Iyegha continued to be paid as though they still held their respective administrative positions for at least a year after they no longer held those positions—Plaintiff from February of 2014 until October of 2015; Dr. Iyegha from the beginning of the 2014–2015 school year (presumably August or September of 2014) until his retirement at the end of September of 2015 or shortly before then. It would thus appear that Plaintiff was treated at least as favorably as Dr. Iyegha. Indeed, Plaintiff may have been treated more favorably than Dr. Iyegha because she continued to receive the salary from her formerly held administrative position for approximately six months more than Dr. Iyegha did. In any event, Plaintiff has not shown that she was both substantially similar to and treated less favorably than Dr. Iyegha. Consequently, Defendant's treatment of Dr. Iyegha does not support Plaintiff's discrimination claims.

\* \* \* \* \*

Plaintiff has therefore failed to establish the fourth element of a prima facie case of discrimination under the *McDonnell Douglas* framework. But that failure "does not necessarily doom . . . [P]laintiff's case." *Smith*, 644 F.3d at 1328.

### 2. *Plaintiff has otherwise failed to support her discrimination claims.*

The Eleventh Circuit has made it clear that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Id.*

> Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."
>
> A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence. Yet, no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.

*Id.* (footnote and citations omitted).

That being said, Plaintiff has not offered anything close to such a mosaic. In support of her claims of discrimination, Plaintiff points to—in addition to her bald assertions of unlawful discrimination—the evidence that Defendant offered two men (one of them white) the OMIA job while Plaintiff was supervising OMIA (Doc. # 47,

30

at 28, 45) and that Defendant allowed Dr. Iyegha and Dr. Williams to maintain the salaries they received in their respective administrative positions for at least some period of time after they left those positions (Doc. # 47, at 43–44). Plaintiff also points to Defendant's shifting—and in her view, unsatisfactory—nondiscriminatory explanations for its termination of Plaintiff's OMIA duties. (Doc. # 47, at 28–29.)

The evidence about Dr. Iyegha and Dr. Williams does not support a reasonable inference of discrimination for the reasons discussed above. Nor does the fact that the OMIA job was offered to two men, especially given the evidence about one (Dr. Havron was offered his old job, which he held on a permanent basis for almost a decade) and the lack of evidence about the other (even his name is not in the record). And the change in Defendant's nondiscriminatory explanations does not add enough to the otherwise underdeveloped mosaic Plaintiff has presented to create a reasonable inference of discrimination.

Nor is the outcome changed by the fact that Plaintiff was ultimately replaced at OMIA by a male—Dr. Whitten, a black male who was hired to permanently supervise OMIA early last year. (Doc. # 29-5, at 68; Doc. # 29-7, at 14.) There is not enough information in the record to indicate whether he would be an adequate comparator for Plaintiff, much less whether he was treated more favorably than Plaintiff. Furthermore, Plaintiff's immediate successor at OMIA—Carol Williams, a black female—is a member of both of Plaintiff's protected classes. The race and

gender of Plaintiff's successors add little if anything to Plaintiff's otherwise lacking mosaic of discrimination.

To the extent Plaintiff's replacement as FAR could be relevant to such a mosaic, the appointment of Dr. Kiser (a white female) to replace Plaintiff as FAR is similarly insignificant. Dr. Kiser is only the second white employee Plaintiff has identified who could be considered a comparator (Dr. Havron being the first). And she was appointed only after two minority candidates (black females and therefore members of both of Plaintiff's protected classes) were unable to accept the job. (Doc. # 29-3, at 87–88.)

Taken together, the evidence in the record hardly presents the kind of mosaic that would allow a reasonable factfinder to infer unlawful discrimination.

\* \* \* \* \*

Plaintiff has provided evidence that she is a member of a protected class, that she was qualified for the positions she held, and that she suffered adverse employment actions. But Plaintiff has not provided sufficient evidence to create a genuine dispute that any of Defendant's conduct was motivated by race or gender, so her discrimination claims necessarily fail.

Discrimination based on race and/or gender is thus not a convincing answer to the "why" questions, and Defendant is entitled to summary judgment on each Plaintiff's claims that rely on that answer (Counts Two and Six).

**B.** **Retaliation for Plaintiff's August 6, 2014 email is not the answer.**

Plaintiff's failure to offer sufficient evidence to create a genuine dispute that Defendant was unlawfully discriminating against her also infects her Title VII retaliation claims based on her August 6, 2014 email to Dr. Boyd (Counts One, Three, and Five):  She has likewise failed to show that the belief she expressed in her email that Defendant unlawfully discriminated against her was objectively reasonable.

Admittedly, a reasonable factfinder could conclude from the evidence in the record that the treatment Plaintiff received as OMIA's supervisor might have made it nearly impossible for her to succeed in that role.  A reasonable factfinder could also conclude that the treatment she received was fairly inexplicable.  Indeed, Plaintiff's email strongly suggests that she was searching for an answer and settled, at least in part, on some sort of discrimination for lack of any other explanation. (Doc. # 29-3, at 40–42.)  At first glance, her invocation of discrimination and the phrase "hostile work environment" seems like little more than the use of buzzwords that often come up in employment disputes.  (Doc. # 29-3, at 42.)  It is not clear that Plaintiff had a good faith belief that Defendant was discriminating against her based on her race and/or gender.  But it is clear that Plaintiff has not raised a genuine dispute that she had an objectively reasonable belief that Defendant was

discriminating against her based on her race and/or gender. That clarity dooms her retaliation claims to the extent they are based on her email.

Where, as here, the evidence is circumstantial, the *McDonnell Douglas* burden-shifting framework detailed in the previous section applies to retaliation claims, although the elements of the prima facie case differ:

> Initially, the employee must establish a prima facie case by demonstrating the following essential elements: (1) the employee was engaged in statutorily protected activity; (2) the employee suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. "Once a prima facie case has been established, the [employer] may come forward with legitimate reasons for the employment action to negate the inference of retaliation." If the employer is able to advance legitimate reasons for the adverse employment action, the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's reasons are pretextual. "[A]t this stage . . . the plaintiff's burden . . . merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination."

*Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310–11 (11th Cir. 2016) (alterations in original) (citations omitted).

As with her discrimination claims, Plaintiff has failed to establish a prima facie case of retaliation. She has provided sufficient evidence to create a genuine dispute that she suffered adverse employment actions. She has shown that a causal link exists between those actions and the allegedly—a key qualifier—protected activity, although it is possible she must show that retaliation was a but-for cause of Defendant's actions, which she has not done. But the court does not need to decide

what causation standard applies because Plaintiff has not established that her August 6, 2014 email constitutes protected activity. More specifically, she has not shown that she had an objectively reasonable belief that Defendant was unlawfully discriminating against her when she sent her email. Consequently, Defendant is entitled to summary judgment on Plaintiff's retaliation claims based on her email to Dr. Boyd.

### 1. *Plaintiff suffered adverse employment actions.*

To demonstrate an adverse employment action under Title VII's anti-retaliation provision, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). A materially adverse action is one that might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

This standard obviously differs from the standard for adverse employment actions under Title VII's antidiscrimination provision, which was discussed in the previous section. *Infra* Subsection V.A.1.a, pp. 22–25. Be that as it may, the termination of Plaintiff's OMIA duties and the October 2015 pay cut constitute adverse employment actions under both standards, as the reasons discussed in the context of Title VII's antidiscrimination provision, *id.*, apply with at least as much

force in the context of Title VII's anti-retaliation provision. Indeed, an adequate showing of an adverse employment action under the standard for the antidiscrimination provision would be more than adequate for the more liberal standard used for the anti-retaliation provision.

Similarly, the expiration and nonrenewal of Plaintiff's final FAR contract constitute adverse employment actions when the facts are viewed in the light most favorable to Plaintiff. Because Plaintiff's FAR contracts included pay stipends (Doc. # 29-3, at 75–83), the expiration and nonrenewal of her final FAR contract resulted in a pay cut for Plaintiff. Moreover, the expiration and nonrenewal of Plaintiff's FAR contract—coming as they did a couple of weeks after the end of her OMIA duties—left her with no duties other than those of a full professor for the first time in five years (Doc. # 29-4, at 10–11), which she reasonably viewed as a demotion (Doc. # 29-4, at 33). The expiration and nonrenewal of Plaintiff's FAR contract thus constitute "materially adverse" actions that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N.*, 548 U.S. at 68 (quoting *Rochon*, 438 F.3d at 1219). They thus constitute adverse employment actions under Title VII's anti-retaliation provision. Defendant's arguments to the contrary—which largely focus on the fact that Plaintiff's FAR contract automatically expired and that Plaintiff served as FAR at the pleasure of Defendant's president (Doc. # 42, at 38–42)—are better suited for

the causation element of the prima facie case and step two of the *McDonnell Douglas* framework.

> **2.** ***Plaintiff has shown that unlawful retaliation may have caused Defendant's adverse employment actions, but she has not shown that unlawful retaliation was a but-for cause of those actions.***

Whether Plaintiff has satisfied the causation element of the prima facie case for her retaliation claims based on her August 6, 2014 email depends on whether the U.S. Supreme Court's holding in *University of Texas Southwest Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), has changed the analysis of retaliation claims at summary judgment. In the absence of clear guidance from the Eleventh Circuit on *Nassar*'s applicability at summary judgment and because the issue is not dispositive, the court offers two analyses of causation on these claims: If *Nassar* does not apply, she has satisfied the causation element. If *Nassar* does apply, she has not.

> **a.** **Plaintiff has demonstrated a causal link between Defendant's adverse employment actions and Plaintiff's allegedly protected activity.**

To establish that a causal link exists between Plaintiff's allegedly protected activity and Defendant's adverse employment actions without applying *Nassar*, Plaintiff "must show that the decision-makers were aware of the [allegedly] protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000),

*overruled on other grounds by Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

Dr. Wilson appears to have been a decision-maker with respect to the termination of Plaintiff's OMIA duties and the October 2015 pay cut, as he drafted and sent the memoranda to Plaintiff informing her of those actions. (Doc. # 29-3, at 44; Doc. # 29-3, at 46.) Plaintiff has shown that he was aware of Plaintiff's August 6, 2014 email to Dr. Boyd, as Dr. Wilson testified that he read the email when Dr. Boyd showed it to him. (Doc. # 29-5, at 37.) Dr. Boyd was the decision-maker with respect to the expiration and nonrenewal of Plaintiff's FAR contract, as Defendant's FAR is appointed by Defendant's president. (Doc. # 46-1, at 23; *see* Doc. # 29-4, at 11–12; Doc. # 29-5, at 49–50; Doc. # 29-8, at 30.) Plaintiff has shown that Dr. Boyd was aware of the email Plaintiff sent to her on August 6, 2014 (Doc. # 29-5, at 37; Doc. # 46-1, at 17.) Plaintiff has thus satisfied the first prong of the causation element.

The second prong can be satisfied by showing "[c]lose temporal proximity between the [allegedly] protected activity and the adverse action." *Shannon*, 292 F.3d at 716–17 (quoting *Bass v. Bd. of Cty. Comm'rs*, 256 F.3d 1095, 1119 (11th Cir. 2001), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008)); *see also Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (citing *Brungart v. BellSouth Telecomms., Inc.*, 231

F.3d 791, 798–99 (11th Cir. 2000)).  As Plaintiff points out (Doc. # 47, at 24), the Eleventh Circuit held in *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322 (11th Cir. 1999), that a span of seven weeks between decision-makers' learning of protected conduct and an adverse employment action was "sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case."  *Id.* at 1337.

Just over five weeks after Plaintiff sent her email to Dr. Boyd, Dr. Wilson sent Plaintiff the memo relieving her of her OMIA duties.  That time span is sufficiently proximate to satisfy the second prong of the causation element with regard to Plaintiff's OMIA claims and Plaintiff's October 2015 pay cut (because a reasonable factfinder could find that the pay cut was triggered by the termination of Plaintiff's OMIA duties).  Admittedly, Plaintiff's FAR contract was allowed to expire without being renewed more than seven weeks after Plaintiff's email to Dr. Boyd.  But it was only six days more, which is only three days more than the time span in *Farley*, 197 F.3d at 1337.  Consequently, the time span between Plaintiff's August 6, 2014 email and the expiration and nonrenewal of her FAR contract is sufficiently proximate to satisfy the second prong of the causation element with regard to the expiration and nonrenewal of Plaintiff's FAR contract.

Defendant counters that Plaintiff's temporal proximity showing with respect to the termination of her OMIA duties is insufficient under *Drago v. Jenne*, 453 F.3d 1301 (11th Cir. 2006), because Defendant had begun the process of selecting

someone to supervise OMIA on a permanent basis before Plaintiff sent her August 6, 2014 email. (Doc. # 42, at 26–30.) In *Drago*, the Eleventh Circuit held "that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago*, 453 F.3d at 1308. But even if Defendant had started to look for someone to supervise OMIA on a permanent basis before Plaintiff's email (and Plaintiff disputes that it had (Doc. # 47, at 25)), there is no indication that Defendant had contemplated terminating Plaintiff's OMIA duties before a permanent supervisor was in place—a move that may seem somewhat suspicious given that Defendant did not hire a permanent supervisor until more than two years after the end of Plaintiff's time at OMIA (Doc. # 29-5, at 68; Doc. # 29-7, at 14). (Doc. # 47, at 24–26, 28.) Defendant thus conflates two separate decisions: (1) beginning the process of hiring a permanent OMIA supervisor, which might eventually lead to the termination of Plaintiff's OMIA duties, and (2) terminating Plaintiff's OMIA duties immediately, well before hiring a permanent OMIA supervisor. That Defendant contemplated the former prior to Plaintiff's email to Dr. Boyd on August 6, 2014, hardly shows that Defendant also contemplated the latter prior to the email. Defendant's counterargument thus fails, meaning temporal

proximity is enough to establish causation for Plaintiff's retaliation claims for the termination of her OMIA duties.

Plaintiff has therefore satisfied both prongs of the causation element of a prima facie case for her Title VII retaliation claims stemming from her August 6, 2014 email. However, this conclusion—and the analysis that led to it—assumes that the but-for causation standard announced in *Nassar* does not apply to the causation prong of the prima facie case of retaliation under the *McDonnell Douglas* framework used at summary judgment.

> **b.** **Plaintiff has not shown that unlawful retaliation was the but-for cause of Defendant's adverse employment actions.**

In *Nassar*, the U.S. Supreme Court held: "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." 133 S. Ct. at 2533. *Nassar* was an appeal from a jury verdict, *id.* at 2524, so how—if at all—it applies at summary judgment is not self-evident.

The Eleventh Circuit has not directly addressed *Nassar*'s applicability to summary judgment in a published opinion, and it expressly reserved the question in at least one unpublished opinion. *Murphree v. Comm'r*, 644 F. App'x 962, 968 (11th Cir. 2016) (per curiam) ("Because [the plaintiff's] claims fail under the burden-

shifting framework established well before *Nassar*, we need not address whether *Nassar* changed our analysis of retaliation claims at summary judgment."). Although the Eleventh Circuit did incorporate *Nassar*'s but-for causation standard at summary judgment in its published opinion in *Trask v. Secretary, Department of Veterans Affairs*, 822 F.3d 1179 (11th Cir. 2016), it did not explain why or exactly how *Nassar* applied at that stage, *id.* at 1194–95. That subsection of the *Trask* opinion indicates that but-for causation is a part of the prima facie case of retaliation under the *McDonnell Douglas* framework, but that would arguably collapse the second and third steps of the *McDonnell Douglas* framework into the causation element of the first step's prima facie case.

Perhaps such a collapse is the inevitable result of *Nassar*'s holding, in which case Plaintiff has failed to establish causation. Plaintiff has not shown that unlawful retaliation was the but-for cause of any of Defendant's adverse employment actions because Defendant has produced plausible alternative explanations for each of its actions and Plaintiff has not rebutted those explanations. Dr. Wilson testified that Plaintiff was relieved of her OMIA duties to accelerate the process of hiring a permanent supervisor for OMIA. (Doc. # 29-5, at 28.) Her FAR contract automatically expired. (Doc. # 29-3, at 75.) Dr. Boyd did not renew Plaintiff's FAR contract because Dr. Boyd had not yet decided who to appoint as FAR (Doc. # 46-1, at 50–51), and Dr. Boyd had the authority to appoint her own FAR (Doc. # 46-1,

at 23) who would serve at her pleasure (Doc. # 29-8, at 30). Dr. Boyd ultimately decided to appoint Dr. Kiser based on the recommendation of the athletic director. (Doc. # 46-1, at 23.) Plaintiff's pay was reduced in October of 2015 to that of a tenured professor because that was the only capacity in which she was serving Defendant. (Doc. # 29-3, at 46; Doc. # 29-5, at 52.)

Plaintiff's responses to those explanations are unpersuasive. She first questions the merit of Defendant's explanations (Doc. # 47, at 24–27, 32–35), but their merit is irrelevant, *see, e.g.*, *Nix v. WLCY Radio/Rahall Commc'ns.*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a [retaliatory] reason." (citing *Megill v. Bd. of Regents*, 541 F.2d 1073, 1077 (5th Cir. 1976))). Then she argues that Defendant's shifting explanations undermine its explanations for terminating Plaintiff's OMIA duties and allowing Plaintiff's FAR contract to expire and not renewing it. (Doc. #47, at 26–27, 33–35.) But these "argument[s] misstate[] what constitutes 'shifting [explanations].'" *Pate v. Chilton Cty. Bd. of Educ.*, 853 F. Supp. 2d 1117, 1133 (M.D. Ala. 2012). The explanations "must contradict each other, and not merely be cumulative." *Id.* (citing *Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 935 (11th Cir. 1995); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004)). Plaintiff has not and cannot show that Defendant's explanations

contradict each other. Lastly, she argues that the record does not support Defendant's explanation for cutting Plaintiff's salary, which she characterizes as budgetary issues. (Doc. # 47, at 45–47.) But Defendant does not have to provide a detailed analysis of its budget to show that it did not have enough money to continue to pay Plaintiff for positions she no longer held.

In sum, Plaintiff has failed to rebut any of Defendant's explanations and likewise failed to show that unlawful retaliation for her August 6, 2014 email was the but-for cause for any of Defendant's actions.

But regardless of whether Plaintiff has satisfied the causation element of the prima facie case for her retaliation claims based on her August 6, 2014 email, those claims fail because she has not satisfied one of the other elements of the prima facie case (as discussed in the next subsection). Therefore, the court does not have to decide if or how *Nassar* applies at summary judgment. *Murphree*, 644 F. App'x at 968.

### 3. *Plaintiff has not provided sufficient evidence that her expressed belief that Defendant was unlawfully discriminating against her was objectively reasonable.*

Plaintiff may have established two of the three elements of a prima facie case of retaliation, but she has failed to establish the third—in other words, Plaintiff has not shown that her August 6, 2014 email constitutes statutorily protected activity. Opposition to unlawful discrimination is a protected activity under Title VII. 42

U.S.C. § 2000e-3(a). But as Defendant notes in its brief in support (Doc. # 42, at 20), a Title VII plaintiff "is required to show that she 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices'" such as unlawful discrimination, *Furcron*, 843 F.3d at 1311 (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)).

> This burden includes both a subjective and an objective component. That is, the plaintiff must not only show that she subjectively (i.e., in good faith) believed the defendant was engaged in unlawful employment practices, but also that her "belief was *objectively* reasonable in light of the facts and record present."

*Id.* (quoting *Little*, 103 F.3d at 960). Even if Plaintiff had a good-faith belief that Defendant unlawfully discriminated against her (Defendant argues that she did not (Doc. # 42, at 20–23)), she has not shown that her belief was objectively reasonable.

"The objective reasonableness of [Plaintiff's] belief is measured by reference to controlling substantive law." *Furcon*, 843 F.3d at 1311 (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008)). That law was discussed in the previous section. *Infra* Section V.A, pp. 19–32. Fortunately for Plaintiff, given the court's finding that Plaintiff has failed to show that Defendant unlawfully discriminated against her, she "is not required to prove that the discriminatory conduct complained of was actually unlawful." *Furcron*, 843 F.3d at 1311 (citing *Little*, 103 F.3d at 960).

Unfortunately for Plaintiff, the conduct Plaintiff opposed must still be at least "close enough" to unlawful discrimination "to support an objectively reasonable belief" that Defendant unlawfully discriminated against her. *Id.* (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)). The conduct Plaintiff described in her August 6, 2014 email simply is not close enough to unlawful discrimination. The only reference to race or gender in that fifteen-paragraph email is her accusation of discrimination. (Doc. # 29-3, at 40–42.) The email contains no explanation of that accusation, and her attempts to explain that accusation in this case have been unpersuasive, *see infra* Section V.A, pp. 19–32. She does reference Dr. Wilson's attempt to bring Dr. Havron—a white male—out of retirement to resume his supervision of OMIA. (Doc. # 29-3, at 41.) But she has provided no reason to think that Dr. Havron's race and/or gender had anything to do with that, especially considering that Dr. Havron was arguably uniquely qualified to supervise OMIA at that time.

All in all, Plaintiff has not shown that the conduct she complained of in her August 6, 2014 email is unlawful discrimination or even close to it. Therefore, Plaintiff has not raised a genuine dispute of material fact that she had an objectively reasonable belief that Defendant unlawfully discriminated against her, meaning she has not shown that her email was protected activity, a necessary element of her prima facie case of Title VII retaliation.

Retaliation for her August 6, 2014 email is thus not a convincing answer to the "why" questions in this case, and Defendant is entitled to summary judgment on each of Plaintiff's claims that rely on that answer (Counts One and Three and part of Count Five).

## C.     <u>Retaliation for Plaintiff filing her first EEOC charge is not the answer.</u>

That leaves only one of Plaintiff's answers to the "why" questions: retaliation for filing her first EEOC charge (Count Five). Because this is another Title VII retaliation claim, the same *McDonnell Douglas* framework detailed in the previous section governs the court's analysis of this claim. As with her other claims, Plaintiff has established that she suffered an adverse employment action—specifically, the $20,000 pay cut in October of 2015. She has also established that she engaged in protected activity, as filing an EEOC charge is protected activity under Title VII. 42 U.S.C. § 2000e-3(a).

But Plaintiff has not established that a causal link exists between her filing of her first EEOC charge and the pay cut even assuming *Nassar*'s but-for causation standard does not apply. Plaintiff primarily relies upon a theory of temporal proximity. (Doc. # 47, at 38–41.) The end date of the time frame for Plaintiff's theory is clear: September 10, 2015, when Dr. Wilson sent Plaintiff a memorandum informing her that her salary would revert to that of a professor effective October 1, 2015 (Doc. # 29-3, at 46).

The start date of that time frame is considerably less clear. Two potential start dates would be March 9, 2015 (when Plaintiff filed her first EEOC charge), and March 10, 2015 (when Plaintiff amended her first EEOC charge). Two other possibilities would be March 19, 2015, and March 20, 2015 (ten days after Plaintiff filed her first EEOC charge and subsequently amended it, respectively) because the EEOC was required to notify Defendant that Plaintiff had filed an EEOC charge within ten days of Plaintiff's filing, 42 U.S.C. § 2000e-5(b), 5(e)(1). Another potential start date would be July 1, 2015 (when Defendant responded to Plaintiff's first EEOC charge (Doc. # 46-7)). Plaintiff has not shown when Dr. Wilson and Dr. Boyd—the two decision-makers with regard to the pay cut—learned about Plaintiff's first EEOC charge, so the actual start date for this time frame is probably somewhere between March 19, 2015, and July 1, 2015.

That would make the approximate time frame for Plaintiff's temporal proximity theory no less than two months and nine days (just over ten weeks) and no longer than six months. "A three to four month disparity between the statutorily protected [activity] and the adverse employment action is not enough" to establish causation via temporal proximity. *Thomas*, 506 F.3d at 1364 (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). That leaves Plaintiff with little, if any, wiggle room: If Dr. Wilson and/or Dr. Boyd learned about Plaintiff's first EEOC charge more than three weeks before Defendant filed its response to that charge, the

time frame would be three months.  Indeed, the Eleventh Circuit has held—albeit in an unpublished opinion—that even a two-month time frame is not sufficiently proximate to establish causation via temporal proximity.  *Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 229–30 (11th Cir. 2011) (per curiam).  *But see Robinson v. LaFarge N. Am., Inc.*, 240 F. App'x 824, 829 (11th Cir. 2007) (per curiam) (noting that a two-month time frame was sufficient to establish a prima facie case of retaliation).

Plaintiff argues that a longer time frame is sufficiently proximate in her situation because Dr. Wilson had to wait to cut Plaintiff's pay until shortly before the start of the next fiscal year—which would have been October 1, 2015—but that he "cut Williams' pay at the first chance he got."  (Doc. # 47, at 40.)  Her primary evidence in support of this argument is that her salary, "when changed in the past, usually changed at the end of the fiscal year, on September 30."  (Doc. # 47, at 40 (citing Doc. # 29-3, at 4–8; Doc. # 29-3, at 14–20).)  But the evidence Plaintiff cites does not support her characterization of it.  She has not pointed to a discernable pattern to the timing of Defendant's adjustments of Plaintiff's salary; in fact, Plaintiff's salary was changed at various points throughout the year.  Moreover, on multiple occasions, Plaintiff was notified of changes to her salary weeks before or after the effective date of those changes.  That not only fails to support Plaintiff's temporal proximity argument, but it also undercuts it in that it strongly suggests that

Defendant was in no way constrained to changing Plaintiff's salary only at the end of a fiscal year.

The net result is that even the shortest time frame Plaintiff has proposed—which she has not submitted adequate evidence to support—to establish causation via temporal proximity is too long. Because Plaintiff has not provided any other evidence of causation, she has failed to establish that element of the prima facie case for Title VII retaliation regardless of whether *Nassar*'s stricter causation standard applies.

* * * * *

Plaintiff came closer to establishing a prima facie case for her claim that Defendant retaliated against her for filing her first EEOC charge than she did for any of her other claims. But close only counts in horseshoes and hand grenades. Retaliation for filing her first EEOC charge is thus not a convincing answer to the "why" questions, and Defendant is entitled to summary judgment on Plaintiff's claims that rely on that answer (Count Six).

## VI. CONCLUSION

Plaintiff describes Defendant's allegedly discriminatory treatment of her as "inexplicable on any legitimate basis" (Doc. # 47, at 20), which led her to conclude that the reason behind it "must be personal and more specifically was likely based on such factors as gender or race" (Doc. # 47, at 21; *see also* Doc. # 29-3, at 42 ("In

my case, the intolerable actions of Dr. Wilson and a few other administrators can only be based on gender, age, or educational background if not race and ethnicity.")). Interpreted charitably, this reasoning sounds somewhat reminiscent of Sherlock Holmes: "[W]hen you have eliminated the impossible, whatever remains, *however improbable*, must be the truth[.]" Arthur Conan Doyle, *The Sign of the Four* 93 (1890). The validity of that reasoning is essential to her discrimination claims and her retaliation claims based on her August 6, 2014 email to Dr. Boyd.

But that reasoning is fatally flawed. Discrimination based on race or gender is hardly the only possible explanation for Defendant's actions, so Plaintiff either failed to consider other possibilities or erroneously deemed them impossible and eliminated them. Two possibilities she did not account for would be administrative inefficiency and/or incompetence. Another would be Dr. Boyd's asserted desire to replace interim officeholders with permanent ones (Doc. # 29-3, at 23), especially if that desire was mixed with administrative inefficiency and/or incompetence. Yet another possibility would be that the reason really was personal but unrelated to Plaintiff's race, gender, or any other illicit factor. And it is doubtful this list of possibilities is exhaustive.

The point of the two foregoing paragraphs is not to help Defendant satisfy its burden under the second step of the *McDonnell Douglas* framework by suggesting ways to negate any inferences of discrimination or retaliation Plaintiff's case may

raise. Rather, the point is to emphasize that Plaintiff's claims of unlawful discrimination seem to be a default position based primarily on her elimination of other explanations. Setting aside whether any mere mortal can successfully employ the above-quoted Holmesian reasoning, *see generally* Holmesian Fallacy, *Rational Wiki*, https://rationalwiki.org/wiki/Holmesian_fallacy [https://perma.cc/2YDL-SRCK], Plaintiff's apparent attempt to do so was unsuccessful.

That fatally undermines her claims of unlawful discrimination. It also fatally undermines her claims of unlawful retaliation for her August 6, 2014 email because it shows that she did not have an objectively reasonable belief that she was the victim of unlawful discrimination. It does not undermine her claim of unlawful retaliation for filing her first EEOC charge; instead, that claim is fatally undermined by Plaintiff's failure to show a causal link between her filing her first EEOC charge and her October 2015 pay cut.

Accordingly, it is ORDERED that Defendant's motion for summary judgment on all of Plaintiff's claims (Doc. # 29) is GRANTED.

A final judgment will be entered separately.

DONE this 6th day of February, 2018.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE
